**CITY OF MASON CITY, Appellant,**

v.

**CITY CENTER OF MASON CITY, INC., Appellee.**

No. 99–1004.

Supreme Court of Iowa.

Oct. 10, 2001.

Herman P. Folkers of Folkers and Keen, Mason City, for appellant.

Charles H. Levad of the Levad Law Office, Mason City, for appellee.

Mark R. Schuling of Brick, Gentry, Bowers, Swartz, Stoltze, Schuling & Levis, P.C., Des Moines, for amicus curiae Iowa Cable & Telecommunications Association.

TERNUS, Justice.

The appellant, City of Mason City, cited the appellee, City Center of Mason City, Inc. (City Center), for violation of a municipal ordinance prohibiting the operation of a cable communication system without a franchise. A judicial magistrate held that City Center had violated the city ordinance and ordered it to remove its cables from the public right-of-way. On appeal, the district court reversed and dismissed the citation against City Center, ruling that City Center did not operate a "cable system" as that activity is defined in the ordinance. Upon our review, we reverse and remand.

I.  *Background Facts and Proceedings.*

The facts of this case are essentially undisputed. City Center is an Iowa corporation that owns a building in downtown Mason City, Iowa that includes apartments. Because the franchised cable services provider in Mason City did not serve this building, City Center installed a satellite dish on the top of the building to

provide cable television to building residents.

To help defray the cost of this system, City Center decided to use the satellite dish on its building to provide cable services, presumably for a fee, to residents of the Kirk Apartments located two blocks away. In order to get the signal to the Kirk Apartments, it was necessary for cable lines to cross three public streets. Prior to proceeding with installation of the lines, City Center negotiated easements with private building owners to attach the cable lines to their buildings. Thus, although the cable lines from the satellite dish to the Kirk Apartments crossed over city streets, the lines were not attached to city property and, in fact, did not touch any city property.

On October 27, 1997, the City cited City Center for operating a cable communication system without a franchise in violation of the Mason City Code of Ordinances section 3–17–4. The citation directed City Center to remove its cables from the public right-of-way.

City Center disputed the citation, and the matter was tried to a judicial magistrate on stipulated facts. The parties stipulated that under the city ordinance a "cable system" may only be operated pursuant to a city franchise. The term, "cable system," as defined in the ordinance, excluded any system "that serves only subscribers in one or more multiple unit dwellings ... no part of which system uses City right of way." The magistrate concluded that City Center did not fall within the exclusion because its cables crossed city streets, and, therefore, its system used city right-of-way. Accordingly, the magistrate held that City Center had violated the ordinance by operating a cable communication system without a franchise. A civil fine was imposed and City Center was ordered to remove its lines from city right-of-way.

On appeal to the district court, the district court concluded that City Center was not "using" the public right-of-way by merely passing cables over city streets, where "[t]he cable is attached solely to private property and does not rely on any public easements." The district court dismissed the citation.

The City sought and was granted discretionary review by this court. *See* Iowa Code § 631.16 (1997); Iowa Rs.App. P. 201, 203.

## II. *Scope of Review.*

■ This case was brought before the court as a law action. Therefore, on discretionary review, the decision of the district court is reviewable for correction of errors at law. *See Hunke v. Veach*, 572 N.W.2d 548, 549 (Iowa 1997); *City of Albia v. Stephens*, 461 N.W.2d 326, 328 (Iowa 1990); Iowa R.App. P. 4.

## III. *Discussion.*

Although this action is based on a municipal ordinance violation, federal law governs. Before we discuss the controlling statute—the Cable Communications Policy Act of 1984—and its preemptive authority, it is helpful to briefly review the concerns underlying the enactment of this law. *See* Cable Communications Policy Act of 1984, Pub.L. No. 98–549, 98 Stat. 2780 (currently codified as amended at 47 U.S.C. §§ 521–573 (1994 & Supp. V 1999)) (the Cable Act). Prior to the Cable Act, the Federal Communications Commission (FCC) pursued "open entry policies in the satellite field for the purpose of creating a more diverse and competitive telecommunications environment." *In re Earth Satellite Communications, Inc.*, 95 F.C.C.2d 1223, 1231 (1983). As the FCC noted in its *Earth Satellite* opinion, "local prior ap-

proval requirements are inconsistent with national policies in these areas." *Id.* at 1232. In balancing the competing interests with respect to the communications industry, the FCC stated:

> The ultimate dividing line, as we see it, rests on the distinction between reasonable regulations regarding use of the streets and rights-of-way and the regulation of the operational aspects of cable communications. The former is clearly within the jurisdiction of the states and their political subdivisions. The latter, to the degree exercised, is within the jurisdiction of this Commission.

*Id.* at 1235.

■■■ The Cable Act reflects this dual regulatory framework by setting up "a comprehensive scheme for the regulation of cable services at the federal, state, and local levels." *Channel One Sys., Inc. v. Conn. Dep't of Pub. Util. Control,* 639 F.Supp. 188, 195 (D.Conn.1986). The Act "establish[es] a national framework for regulating cable television," while at the same time "provid[ing] for the franchising of cable systems by local governmental authorities." *FCC v. Beach Communications, Inc.,* 508 U.S. 307, 309, 113 S.Ct. 2096, 2099, 124 L.Ed.2d 211, 219 (1993). The breadth of local authorities' power to franchise "cable systems" is controlled by the federal definition of "the operative term 'cable system.'" *Id.* at 310, 113 S.Ct. at 2099, 124 L.Ed.2d at 219. That is because the franchise power of local government extends only to those entities meeting the federal definition of that term. *See generally* 47 U.S.C. §§ 541–547.

■■■ The Mason City ordinance at issue here acknowledges the dual framework en-visioned by the Cable Act. Section 3–17–4 states:

> All cable communication activity within the City shall be undertaken pursuant to a franchise granted by the City, and shall be in accordance with the provisions of this Chapter. A grantee shall at all times comply with the rules and regulations of the FCC as well as with all other applicable Federal and State statutes. FCC rules and regulations shall in all cases be controlling if any part of this Chapter or any cable television franchise is in conflict with any FCC rules and regulations.

Mason City Code of Ordinances § 3–17–4. The parties agree that the City cannot require a franchise if the service provided does not meet the federal definition of "cable system." *See Guidry Cablevision/Simul Vision Cable Sys. v. City of Ballwin,* 117 F.3d 383, 383 (8th Cir.1997) (stating that the FCC "has invoked federal preemption to preclude local governments from requiring that an exempt private cable operator obtain a local franchise"). That definition is as follows:

> [T]he term "cable system" means a facility, consisting of a set of closed transmission paths and associated signal generation, reception, and control equipment that is designed to provide cable service which includes video programming and which is provided to multiple subscribers within a community, but such term does not include ... (B) a facility that serves subscribers *without using any public right-of-way* ....

47 U.S.C. § 522(7) (emphasis added).[1]

■■■ It is undisputed that City Center provides a service that falls within the

---

**1.** At the time of the citation at issue here, the Mason City Code of Ordinances contained a definition of "cable system" that tracked with a prior version of the federal definition of this term. *Compare* Mason City Code of Ordinances § 3–17–2, *with* 47 U.S.C. § 522(6) (1988). A 1996 amendment to the federal definition eliminated a requirement that the

general definition of "cable system." The bone of contention is whether City Center's cable system "uses" public right-of-way within the meaning of the private cable exemption contained in § 522(7)(B).

Congress did not define the word "uses" or the phrase "uses any public right-of-way." *City of Chicago v. FCC*, 199 F.3d 424, 431 (7th Cir.2000); *Guidry Cablevision*, 117 F.3d at 385. Therefore, we initially must determine whether the agency charged with administration of the Cable Act—the FCC—has formulated an interpretation. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694, 703 (1984). *See generally United States v. Southwestern Cable Co.*, 392 U.S. 157, 178, 88 S.Ct. 1994, 2005, 20 L.Ed.2d 1001, 1016 (1968) (holding that the FCC's authority extends to cable television systems).

▆▆▆▆ As the United States Supreme Court stated in *Chevron, U.S.A.*, it has long been "recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." 467 U.S. at 844, 104 S.Ct. at 2782, 81 L.Ed.2d at 704. If the construction adopted by the agency " 'represents a reasonable accommodation of conflicting policies that were

committed to the agency's care by statute, [the agency interpretation] should not [be] disturb[ed] . . . unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.' " *Id.* at 845, 104 S.Ct. at 2783, 81 L.Ed.2d at 704 (quoting *United States v. Shimer*, 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908, 915 (1961)).[2]

Upon our examination of relevant authorities, we find insight into the FCC's interpretation of the word "uses" in a report and order issued by the agency in 1990. *See In re Definition of a Cable Television System*, 5 F.C.C.R. 7638 (1990). The proceeding giving rise to this report was commenced "to clarify [the agency's] interpretation of the statutory term, 'cable system' as defined in the Cable . . . Act of 1984." *Id.* at 7638. The FCC had sought comment on two issues: (1) the "implications of treating facilities connected only by radio (or infrared) transmission and making use of no other interconnecting wires or cables as cable systems"; and (2) "whether facilities serving multiple unit dwellings that do not use public rights-of-way might in some instances be cable systems within the Act's definition." *Id.*

In discussing these issues, the FCC noted "the dual federal-local jurisdictional ap-

system "serve[ ] only subscribers in 1 or more multiple unit dwellings under common ownership, control, or management." Cable Reform Act of 1996, Pub.L. No. 104–104, § 301(a), 110 Stat. 114 (codified at 47 U.S.C. § 522(7) (Supp. V 1999)). To the extent the City's ordinance retained the requirement of commonality after the 1996 amendment, the ordinance is contrary to federal law and, therefore, the municipal definition of "cable system" is preempted.

2. It is perhaps appropriate at this point to explain why we have chosen to apply the *Chevron, U.S.A.* test in lieu of following the Eighth Circuit's reasoning in *Guidry*, as we

have been urged by City Center to do. In *Guidry*, the court held that a cable system that passed under a public street was not "using" the public right-of-way. 117 F.3d at 386. In determining the meaning of "use," the court turned to criminal cases interpreting "uses" in the context of criminal statutes. *Id.* at 385. We find this analysis unpersuasive and at odds with the principles set forth by the United States Supreme Court in *Chevron, U.S.A.* The fact that the FCC has interpreted the statutory language at issue here makes resort to analogous areas of the criminal law unnecessary and inappropriate. *See id.* at 386–88 (Bright, J., dissenting).

proach to regulating cable television service is largely premised on the fact that cable systems necessarily involve extensive physical facilities and substantial construction upon and use of public rights-of-way in the communities they serve." *Id.* at 7639. Thus, even prior to the Cable Act of 1984, there was a "fundamental understanding" that systems consisting solely of an internally wired building "were not deemed to be cable systems for jurisdictional purposes" because such systems made no use " 'of local rights-of-way before commencing operation.' " *Id.* at 7640 (quoting *In re Amendment of Part 76 of the Commission's Rules and Regulations With Respect to the Definition of a Cable Television System and the Creation of Classes of Cable Systems,* 54 F.C.C.2d 824, 835 (1975)). Consistent with this history, the FCC concluded "the term cable system as used in the Act encompasses only video delivery systems that employ cable, wire, or other physically closed or shielded transmission paths to provide service to subscribers." *Id.* at 7638. Thus, "systems serving more than one multiple unit dwelling interconnected only by radio or infrared facilities ... are not cable systems." *Id.*

In its discussion of the private cable exclusion, the FCC observed that it had sought comment "with respect to the question of what constitutes a *crossing* of a public right-of-way." *Id.* at 7641 (emphasis added). The FCC stated that its "use of the term 'crossing' was not meant to imply anything different" from "the specific statutory language refer[ing] to 'uses' of a public right-of-way." *Id.* at 7641–42.

Nonetheless, the FCC concluded "Congress did not intend to include within the meaning of the term 'use' of a public right-of-way the mere passing over of such a right-of-way *by electromagnetic radiation.*" *Id.* at 7642 (emphasis added). It noted that "radio waves may cross a public right-of-way but do not use it." *Id.* In contrast, the FCC made the following statements with respect to closed transmission systems, such as the system at issue here:

> Whether a facility uses a right-of-way, of course, remains relevant to whether a multi-building system interconnected by *closed transmission paths* falls within the private cable exemption.... If the facility does *cross* a public right-of-way, it will be considered a cable system for purposes of the Cable Act and our rules.

*Id.* (emphasis added). The United States Supreme Court has interpreted the FCC's discussion of the exemption in this report as equating "uses" with "crosses": "Consistent with the plain terms of the statutory exemption, the Commission concluded that such an SMATV [3] system is subject to the franchise requirement if its transmission lines ... use *or cross* any public right-of-way." *Beach Communications,* 508 U.S. at 311, 113 S.Ct. at 2100, 124 L.Ed.2d at 220 (emphasis added).

That the FCC interprets the word "uses" as synonymous with "crosses" is indicated in other reports it has issued as well. As early as 1985, the FCC, in a report and order regarding the implementation of the equal employment opportunity provisions of the Cable Act, stated:

---

**3.** "SMATV" is an acronym for a satellite master antenna television system. In such a system a television signal is transmitted from a satellite to satellite-receiving stations atop buildings, such as the satellite dish used by City Center. The signal is then "converted to a usable frequency and distributed to sub-scribing tenants through [an] MATV system." *N.Y. State Comm'n on Cable Television v. FCC,* 749 F.2d 804, 806 (D.C.Cir.1984). An MATV (master antenna television) system delivers the signal to tenants through coaxial cables that run through the building. *See id.*

"The House Report on the Cable Act indicates that SMATV operators are subject to the EEO provisions regardless of whether the systems only serve commonly-owned apartments without *crossing* public rights of way." *In re Amendment of Part 76 of the Commission's Rules to Implement the Equal Employment Opportunity Provisions of the Cable Communications Policy Act of 1984,* 102 F.C.C.2d 562, 566 (1985) (emphasis added). More recently, the FCC used similar language in a notice of proposed rulemaking and in an annual report to Congress. In its notice of proposed rulemaking, the FCC stated that private cable operators "do not use hard-wired *crossing* of public rights-of-way, and, therefore are not considered 'cable systems.' " *In re: Petition for Rulemaking to Amend Eligibility Requirements in Part 78 Regarding 12 GHZ Cable Television Relay Service,* 14 F.C.C.R. 11,967, 11,967 (1999) (emphasis added). In a recent annual report, the FCC similarly stated: "Under the 1996 Act, SMATV operators may use wires to connect separately owned buildings, so long as the wires do not *traverse* public rights-of-way." *In re Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming,* 22 Communications Reg. (P & F) 1414, 1442 (2001) (emphasis added). *See generally Webster's Third New International Dictionary* 2433 (unabr. ed.1990) (defining "traverse" in part as "to go or travel across or over"). We conclude the FCC interprets the term "uses" to include the crossing of public right-of-way by physically closed pathways (cables), such as occurred in this case.

The FCC's interpretation is controlling here if it " 'represents a reasonable accommodation of conflicting policies that were committed to the [FCC's] care by statute, ... unless it appears from the [Cable Act] or its legislative history that the accommodation is not one that Congress would have sanctioned.' " *Chevron, U.S.A.,* 467 U.S. at 845, 104 S.Ct. at 2783, 81 L.Ed.2d at 704 (quoting *Shimer,* 367 U.S. at 383, 81 S.Ct. at 1560, 6 L.Ed.2d at 915). As we have already discussed, the primary justification for local control "was cable television's use of public rights-of-way." *See City of Chicago,* 199 F.3d at 429. "The existence of physical and economic limitations on the number of cable systems that can be constructed and operated in a single community has also been cited as a justification for local regulation." *Qwest Broadband Servs., Inc. v. City of Boulder,* 151 F.Supp.2d 1236, 1241 (D.Colo.2001). These rationales are logically related to the fact that local governments have an interest in the maintenance and operation of their public rights-of-way to ensure public safety and convenience. *See In re: Entertainment Connections, Inc.,* 13 F.C.C.R. 14277, 14307 (1998) ("The public safety, convenience and management of public rights-of-way provide a key premise for the cable franchise requirement."). We think the FCC could reasonably determine that when a cable provider crosses a public right-of-way with a closed transmission pathway, the passing of the cable over the right-of-way has an effect on local government's ability to efficiently and safely control, operate and maintain the right-of-way. Therefore, the FCC's interpretation of the statutory exemption to allow local franchising control in such situations is understandable.

That brings us to the ultimate issue: does this interpretation represent a reasonable accommodation of the varying policies implicated in this situation? City Center argues that it will not be able to compete in the provision of cable television services if it is required to comply with the requirements for a franchise. The interest of the public in robust competition is not, however, necessarily affected to a great

extent by the FCC's interpretation of the "cable system" definition. The ability of local governments to impose requirements on franchised cable systems extends only as far as the preemption doctrine permits.[4] *See* 47 U.S.C. § 556(c) (1994) (providing that any franchising provision "which is inconsistent with this chapter shall be deemed to be preempted and superseded"); *MediaOne Group, Inc. v. County of Henrico,* 97 F.Supp.2d 712, 714 (E.D.Va. 2000) (holding city ordinance imposing requirement on franchised cable operator was preempted and therefore was an unlawful condition); *Cablevision Sys. Corp. v. Town of E. Hampton,* 862 F.Supp. 875, 888 (E.D.N.Y.1994) (modifying franchise agreement to bring it into conformity with federal law). In other words, a municipality's power to regulate the use of its right-of-way through its franchising authority cannot be used as a subterfuge to regulate competition among cable systems. *Qwest Broadband Servs., Inc.,* 151 F.Supp.2d at 1244 (holding that city's franchise requirements were preempted because they conflicted with the clear congressional purpose of "promoting vigorous competition"). Therefore, we do not think congressional intent to promote competition in this industry is compromised by the FCC's interpretation of the Cable Act in such a way as to subject cable systems, like the one at issue here, to local franchising control.

We conclude that the FCC's interpretation of the word "uses" in the definition of "cable system" is a reasonable accommoda-tion of the competing policies—maintenance of local control over government rights-of-way versus promotion of a competitive environment in the cable television industry. Because the FCC's interpretation is reasonable, it is controlling here. *See City of Chicago,* 199 F.3d at 428 (holding that court "may not substitute [its] own construction of a statute when an agency has interpreted it in a reasonable fashion"). Applying this interpretation, we hold that City Center cannot claim sanctuary in the private cable exclusion. Because its cable passes over city right-of-way, City Center "uses" city right-of-way. Therefore, the exemption does not apply.

The district court erred in interpreting the ordinance to allow City Center to use city right-of-way without having first obtained a franchise. We reverse the decision of the district court and remand for entry of an order affirming the ruling of the judicial magistrate.

**REVERSED AND REMANDED.**

---

4. It may be that certain franchise requirements set forth in the Mason City Code of Ordinances go beyond the power allocated to local authorities, but that issue has not been raised here. Even if it had been raised, it is not ripe for review, as the record does not show that City Center has even applied for a franchise. *See State v. Iowa Dist. Ct.,* 616 N.W.2d 575, 578 (Iowa 2000) (holding that courts should not be involved in " 'abstract disagreements over administrative policies ... until an administrative decision has been formalized' " (quoting *Abbott Lab. v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681, 691 (1967))). The issue here is solely whether City Center falls within the definition of "cable system," so as to be subject to the city's franchising authority in general. Consequently, we do not consider the validity of the conditions that potentially could be imposed on a franchisee under the ordinance.