**UNITED STATES of America, Plaintiff, Appellant,**

v.

**Daniel TURNER, Defendant, Appellee.**

No. 98–1258.

United States Court of Appeals, First Circuit.

Heard Dec. 9, 1998.

Decided Feb. 26, 1999.

lone, Assistant United States Attorney, were on brief for appellant.

James C. Munch III, with whom Terence M. Harrigan and Vafiades, Brountas & Kominsky were on brief for appellee.

Before SELYA, Circuit Judge, CYR, Senior Circuit Judge, and STAHL, Circuit Judge.

CYR, Senior Circuit Judge.

After police detectives discovered several nude photographs in his personal computer files, defendant Daniel Turner was indicted for possessing child pornography in violation of 18 U.S.C. § 2252. Thereafter, the district court suppressed the photographs and the government brought this interlocutory appeal. *See id.* § 3731. We affirm the district court ruling, albeit on different grounds.

## I

### *BACKGROUND* [1]

At 2:00 a.m. on July 28, 1997, 26–year–old Megan Thomas was awakened in her bedroom by a masked intruder wielding a knife. During the ensuing struggle Thomas cut her hands when she grabbed the knife. The intruder fled. Turner, who lived in the apartment next door to Thomas, notified the Bangor police. When police detectives arrived at the scene, Turner told them that while seated upstairs at his computer he had observed the intruder fleeing the Thomas apartment, then telephoned the police.

The next morning, Bangor Police Detectives Reagan and Gould returned to the crime scene for further investigation, and noticed that window screens on both the Thomas and Turner apartments were ajar and the sill on the Turner apartment was smeared with blood. The detectives awakened Turner, told him about these discoveries, and expressed their concern that the intruder might have entered Turner's apartment as well. Turner responded by handing the detectives a knife which he claimed to have found near his kitchen sink, but did not remember having placed there. The knife fit

F. Mark Terison, Assistant United States Attorney, with whom Jay P. McCloskey, United States Attorney, and Gail Fisk Ma-

---

1. The evidence is related in the light most favorable to the suppression ruling. *See United States*    *v. Martinez–Molina,* 64 F.3d 719, 723 (1st Cir. 1995).

the description Thomas had given the police earlier.

The detectives then obtained verbal consent to "look around" Turner's apartment. At that point Turner was not considered a suspect in the Thomas assault. Turner accompanied the detectives on their initial tour of his apartment, during which they found additional blood stains on the stairway walls leading to the second floor, and on a trash can lid in the computer room on the second floor. When asked about these discoveries, Turner could provide no explanation.

The detectives then began to suspect that Turner was the assailant. At their request, Turner signed a written consent to search "the premises," "his vehicle," and "personal property." Before doing so, he was expressly told that the officers would search for "any signs the suspect had been inside [the apartment]," "any signs a suspect had left behind, or anything of that sort," and "evidence of the assault itself."

While a detective remained on the first floor with Turner, other officers began their 90–minute search of the second floor. In the closet of the second-floor computer room, Detective Gould found several videotapes which apparently contained sexually explicit material. Then, while removing boxes from the closet and stacking them on or near the computer station, Gould noticed that Turner's computer monitor screen suddenly turned on, and the Windows "desktop" disclosed a photograph of a nude woman with "light-colored hair," which Gould concluded was "similar" to Ms. Thomas' hair color based on descriptions Gould had been given.

At that point Gould seated himself at the computer and engaged the "mouse" to access the "Documents" index from the Windows 95 task bar, which itemized titles of files most recently accessed by Turner. Gould noticed several indexed files with the suffix ".jpg," denoting a file containing a photograph. After clicking on these file names, he located photographs of nude blonde women in bondage. Further into the "Documents" listing,

he noted several text files bearing titles which suggested rape and/or bondage. After calling the district attorney's office for guidance, Gould copied the adult-pornography files onto a floppy disk.

Gould then searched the computer hard drive for other incriminating files. Opening the "My Computer" icon and a folder labeled "G–Images," he noted several files with names such as "young" and "young with breasts." Upon opening one such file, he viewed what he believed to be child pornography, then closed down and seized the computer. It was at this point that Turner first came upstairs and discovered that his computer files had been subjected to search.

After Turner was charged in a single count with possessing child pornography, see id. § 2252, he moved to suppress the computer files. The district court granted the motion following a suppression hearing, on the ground that it was not objectively reasonable for Detective Gould to have concluded that evidence of the Thomas assault—the stated object of the consent search—would be found in files with such labels as "young" or "young with breasts."

## II

### DISCUSSION

The district court ruled that even if the Turner consent authorized the opening of nondescript files containing photographs, it did not permit the opening of files labeled "young" or "young with breasts," which were unlikely to contain evidence pertinent to the Thomas assault. The government vigorously responds that the consent was so broad—authorizing search of all Turner's "personal property"—that it necessarily encompassed a comprehensive search of his computer files. As we conclude that the consent did not authorize the search of the computer, we affirm the district court judgment. See United States v. Doe, 61 F.3d 107, 111–12 (1st Cir.1995) (appellate court may affirm suppression ruling on any ground apparent in the record).[2]

2. The rationale relied upon by the district court appears somewhat problematic. If the Turner consent did enable a computer search, arguably

the file labels therein would not have constrained the scope of the search. By analogy, for example, had Turner consented to the search of un-

■ Since it comes within an established exception to the Fourth Amendment warrant requirement, "[a] consensual search may not exceed the scope of the consent given." *United States v. Rudolph*, 970 F.2d 467, 468 (8th Cir.1992).[3] "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991); *United States v. Donlin*, 982 F.2d 31, 33 (1st Cir.1992).[4] We therefore look beyond the language of the consent itself, to the overall context, which necessarily encompasses contemporaneous police statements and actions.

■ "The scope of a [consensual] search is generally defined by its *expressed object*." *Jimeno*, 500 U.S. at 251, 111 S.Ct. 1801 (emphasis added); *Doe*, 61 F.3d at 112 n. 7; *see United States v. Pena*, 143 F.3d 1363, 1368 (10th Cir.), *cert. denied*, — U.S. —, 119 S.Ct. 236, 142 L.Ed.2d 194 (1998); *United States v. Saadeh*, 61 F.3d 510, 518 (7th Cir.1995). For example, in *United States v. Dichiarinte*, 445 F.2d 126 (7th Cir.1971), police officers who sought consent to search the defendant's premises had made "repeated reference to [their] interest in narcotics [ ] and there was no indication that they desired to look for anything other than narcotics themselves." *Id.* at 129. After the defendant consented, however, the officers inspected personal papers. The Seventh Circuit held that the search exceeded the scope of the consent: "Government agents may not obtain consent to search on the representation that they intend to look only for certain specified items and subsequently use that

consent as a license to conduct a general exploratory search." *Id.* at 129–30 & n. 3 ("Thus if government agents obtain consent or a warrant to search for a stolen television set, they must limit their activity to that which is necessary to search for such an item; they may not rummage through private documents and personal papers.").

■ In the present case the detectives preliminarily restricted the scope of the consent in several respects. Upon their arrival at the Turner apartment early in the morning on July 28, the detectives, by their own admission, did not consider Turner a suspect in the Thomas assault. *See supra* Section I, ¶ 2. Rather, after finding a window screen ajar in the Turner apartment, they suspected that Thomas's assailant might have broken into the Turner apartment while fleeing the crime scene next door, something which Turner presumably need not have done to gain access to his own apartment.

Later, after finding a knife and scattered blood stains for which Turner could provide no explanation, and before Turner signed the written consent form, the detectives told Turner that he was a suspect. The detectives nevertheless couched their search request in terms normally understood to refer only to an intruder, rather than a permanent resident, by announcing their intention to look for "any signs the suspect had been inside [the apartment]," and "any signs a suspect had *left behind.*" *See, e.g., United States v. Elliott*, 107 F.3d 810, 815 (10th Cir.1997) (where officer "explained to [the person whose consent was being sought] that he just wanted to see how things were 'packed' or 'packaged[,]' [w]e conclude that a typical reasonable person would have construed these

---

locked containers on the premises, we doubt seriously whether his deceptive labeling of an individual container (*e.g.,* "Flour") would preclude a consensual search, provided the container was capable of holding whatever contraband was the target of the search. Since we affirm on other grounds, however, we need not rule on the district court rationale.

**3.** It was for the government to prove that the computer-file search was within the scope of the consent. *See United States v. Schaefer*, 87 F.3d 562, 569 (1st Cir.1996); *United States v. Cruz Jimenez*, 894 F.2d 1, 6 (1st Cir.1990).

**4.** Although divergent standards of review have emerged, *compare United States v. Stewart*, 93 F.3d 189, 192 (5th Cir.1996) (scope of consent reviewed *de novo;* underlying factual findings reviewed only for clear error), *with United States v. Martel–Martines*, 988 F.2d 855, 858 (8th Cir. 1993) (scope of consent—a factual issue—reviewed only for clear error), we need not select at this juncture, since we would affirm under either standard.

additional statements as expressly limiting the scope of [the officer's] request"); 3 Wayne R. LaFave, *Search and Seizure* § 8.1(c), at 620 (3d ed. 1996) ("When a purpose is included in the [officer's] request, then the consent should be construed as authorizing only that intensity of police activity necessary to accomplish the stated purpose.").

We think that an objectively reasonable person assessing in context the exchange between Turner and these detectives would have understood that the police intended to search only in places where an *intruder* hastily might have disposed of any *physical evidence of the Thomas assault* immediately after it occurred; for example, in places where a fleeing suspect might have tossed a knife or bloody clothing. Whereas, in sharp contrast, it obviously would have been impossible to abandon physical evidence of this sort in a personal computer hard drive, and bizarre to suppose—nor has the government suggested—that the suspected intruder stopped to enter incriminating evidence into the Turner computer. *Cf. United States v. Kim*, 27 F.3d 947, 956 (3d Cir.1994) ("[W]hen one gives general permission to search for drugs in a confined area, that permission extends to any items within that area that a reasonable person would believe to contain drugs.").

Similarly, we cannot accept the government's contention that the sexually suggestive image which suddenly came into "plain view" on the computer screen rendered Turner's computer files "fair game" under a consensual search simply because the Thomas assault had a sexual component (*e.g.*, the attempt to tie her hands). The critical consideration in this regard is that the detectives never announced, *before Turner gave his consent*, that they were investigating a sexual assault or attempted rape. Nor is it material to the present inquiry that Turner, as the alleged assailant, would have been familiar with the details of the assault based on his first-hand knowledge, since the test is not subjective reasonableness, but *objective*

reasonableness. *See Jimeno*, 500 U.S. at 251, 111 S.Ct. 1801.

Thus, assuming *arguendo* that such computer images could be considered circumstantial evidence of a planned sexual assault, an *objectively reasonable person* assessing the actual exchange between the detectives and Turner would not have understood that such images were within the "expressed object" of the intended search for evidence of an aggravated assault. *See Elliott*, 107 F.3d at 815 (finding that officer's contemporaneous statements limited scope of consent); *cf. United States v. Infante–Ruiz*, 13 F.3d 498, 505 (1st Cir.1994) (finding consent invalid where, *inter alia*, police officer "did not notify [the consenter] that he was looking for drugs, making it somewhat more difficult to impute to [the consenter] consent to search every container within the car that might contain drugs").[5] The objective reasonableness of this understanding becomes even more clear when one considers the *fruits* of the consensual search which had taken place just before Turner signed the written consent; that is, the concrete physical evidence associated with the *assault itself*, including scattered blood stains and a knife which fit the description given by the victim. Moreover, when the detectives later announced their intention to search for "evidence of the assault *itself*," an objectively reasonable person likely would infer that they intended to search for evidence of the same ilk; that is, for incriminating objects directly linked to the nearby crime scene, not for documentary or photographic evidence. *See United States v. Gutierrez–Hermosillo*, 142 F.3d 1225, 1231 (10th Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 230, 142 L.Ed.2d 189 (1998) (courts must examine totality of circumstances in determining scope of consent); *United States v. Torres*, 32 F.3d 225, 231 (7th Cir.1994) (same); *United States v. Huffhines*, 967 F.2d 314, 319 (9th Cir.1992) (same).

Furthermore, aggravated assault is neither akin to so-called "paper trail" crimes like bank or mail fraud, nor to possession of child pornography, wherein the suspect might be expected to retain evidence of the offense

---

**5.** Aggravated assault contains no implicit sexual-assault component, *see* Me.Rev.Stat. Ann. tit. 17–A, § 208, nor would the victim's gender automatically give rise to such an inference.

itself among personal papers or in a computer hard drive. *See United States v. Hall,* 142 F.3d 988, 995–97 (7th Cir.1998) (noting that child pornographers often download photographic images from the Internet, and store them on hard drives).[6] Thus, we believe that an objective observer, witnessing in context the pre-consent exchange between Turner and the investigating detectives, reasonably would construe "evidence of the assault itself" to mean physical evidence linked to the crime scene, rather than documentary or photographic evidence.

Finally, the government argues, even if Turner's original consent was circumscribed, he expanded the authorization by failing to object to the computer-file search. *See, e.g., United States v. McRae,* 81 F.3d 1528, 1538 (10th Cir.1996)("[Defendant's] [f]ailure to object to the continuation of the search ... may be considered an indication that the search was within the scope of the consent.") (citations omitted). We find this argument lacking as well, since the detectives testified that Turner was downstairs with Detective Reagan *throughout* Detective Gould's search of the computer located upstairs. Thus, Turner had no meaningful opportunity to object before the computer search was completed. *Cf. United States v. Stribling,* 94 F.3d 321, 324 (7th Cir.1996) ("[Defendant] was *present* during the search; she could (and should) have protested at the time if she believed [the police] exceeded the scope of her consent, as it was her burden to limit that scope.") (emphasis added). We emphasize, nonetheless, that our decision is predicated upon the particular facts of this case, and in no sense represents a *per se* rule on computer searches.

*Affirmed.*

---

6. This is not to suggest that stray incriminating evidence might not be discovered among the personal papers, diaries or computer files of someone who planned and committed an aggravated assault. Were such remote and speculative prospects sufficient, however, consensual searches could become effectively boundless, since the same rationale would apply to virtually any type of criminal offense.